We'll hear counsel in U.S. X-Ray University of Medicine and Dentistry, Dr. Hill. Good morning, Your Honors. Good morning. My name is Sheldon Pincus. I represent Dr. Helene Z. Hill. I'd like to request two minutes of rebuttal. That's granted. In this matter, Your Honors, we seek the reversal of the grant of summary judgment to the defendants and entry of partial summary judgment on liability aspects of this case in favor of Dr. Hill. Mr. Pincus, my husband departed, but my husband was a researcher, medical researcher at a university. And so I've been trying to put myself in his view. Why isn't this just – I mean, all these experts that had a chance to consider this claim, nobody found a violation of anything. They said it could continue. So why don't they know more than we know? We're just judges. I don't know about my colleagues, but my husband was shocked I never had a science course in my life. How are we supposed to decide this? The answer to the question is that, number one, when the Office of Research Integrity reviewed the claims, they limited it to the two experiments which Dr. Hill was aware of, both in 1999 and 2001. And in analyzing whether scientific misconduct occurs, the definition of scientific misconduct requires an intentional act as opposed to a violation of the False Claims Act, which, as we know, the definition of knowingly becomes broader. But more importantly, what they did not have available and what makes this case so important is that there was deliberate concealment on Dr. Howell's part insofar as coming forth with what he was made aware of by Dr. Hill all the way back in 1999. Did he have to believe her? Did he have to believe her? I mean, I have the feeling that there was a lot of personal animosity going on in this lab. I think that when you had two competing results, one by his post-doctorate, Dr. Beshaye, and one by the individual, a co-investigator, Dr. Hill, who had been deliberately chosen because of her expertise and her ability to set up these assays and conduct these experiments. Chosen by whom? For what? She was chosen by Dr. Howell to serve as co-investigator on this grant. And when her personal observations show that Dr. Beshaye is conducting an experiment which is completely contrary to the results that she had obtained in those experiments and which favored a result showing that there was, in this case, no hypoxia and supported the whole essence of the grant, then I believe Dr. Howell had an obligation on the basis of the scientific method alone, let alone the policies of the university, to resolve those before he chose the result that in essence allowed him to compete more favorably for federal monies to support the grant. You believe, is that found anywhere in regulations? Was he compelled, was he required by statute or by regulation to reveal at any point, and this would have had to have been after the original application, right? After the 1999 application? It would have had to have been in one of the supplementals. Alternatively, he would not have filed the original application. He wouldn't have known the original application, would he? None of this was available to him really at the time. He knew the different results between what Dr. Hill found in 1999 and what Dr. Beshaye had. He deliberately chose the result that would favor his obtaining federal monies for this grant rather than resolving those before he made application for a grant that had already been rejected. That's an inference you're drawing, but my question is, again, was he required by law to have revealed this difference of opinion in any of the later submissions that he made, in the status reports or the reapplications? The progress reports themselves, in each of those which are part of the record, demonstrate that there is a section where there is a summary of progress and which the regulations, I think it's PHS 2590, obligate the primary investigator to set forth technical difficulties, negative results. That creates the duty. In fact, those subsequent submissions also require that all of the participants be listed. And Dr. Hill continued to be listed each time in those status reports, didn't she? She was listed in those, that is correct. But the obligation of those filings went to the primary investigator, in that case Dr. Hallett. And then, beyond that, we know that by the time he was unable to replicate these results, after 22 trials, and he files in 2005 for a continuation grant, knowing that these can't be replicated, he puts in the same data again. Now, again, in that instance, you look to the NIH grant policy statement, which obviously contains the certification that they are not only certifying to the truth of the data and the information contained within the proposal for the grant, but they also take responsibility for the scientific conduct of the project. And the grantee institution, UMDNJ, in those very regulations, also, by signing, undertake the responsibility to ensure the validity of that data. And the reason is... Excuse me. Did Dr. Hill ever in any way notify NIH that she no longer supported this grant application? I believe that when she went to ORI, she made that position clear. And when was that? What was the timing on that? After she first got the results from the first committee on scientific misconduct, I believe that was in 2001, when she then went to... August of 2001 is when she went to ORI, Your Honor. Did she still... Was she still listed on whatever was filed with NIH? I think by that point in time, she was still listed. It was subsequent to her filing those complaints that other individuals then started to assist Dr. Howell with respect to... Yeah, but that's just an add. I'm only asking you about a subtract. What she was also concerned about... Did she ever send NIH anything that says, take my name off, I don't support this anymore? That's what she was seeking to obtain, not only through UMDNJ, but through ORI. No, but did she... My question is, did she ever do that? Do you have a letter in the file or in the appendix? I don't believe there's anything in the file directly to NIH seeking to get her name off the grant or the publications, which Dr. Vershahi subsequently continued to do that. Did she notify wherever those journals... Those were in journals, I guess, right, publications? Scientific journals? They were in scientific journals. Did she notify the editors of those journals to take her name off? No. And I know that that's been done in science. Well, I believe what was required to be done, Your Honor, is she had to pursue her complaint, and the responsibility for that action, as we contend, fell to Dr. Howell. You look at the Milan case, when they were challenged, that's exactly why... She's the one who's complaining, not Dr. Howell. Dr. Howell apparently accepts, given the differences, for all we know, he accepts the results reported by his associate, Vershahi. And my question is, she's the one who's bringing these complaints. She says this information is either unsupported or untrue, and what did she do to disassociate from those publications? What she did was pursue what she understood to be the policies of the university in filing a complaint of scientific misconduct, seeking those very remedies. But she let her name be on the publications. And that's exactly what she was trying to disavow. Yeah, but you do that by sending a letter. She understood that those were the processes that had to be followed. But you do that by sending a letter to the editors of the journal, and say, I can't support this, take my name off. Her understanding was that this was what the policies of UMDNJ dictated, and that through following that up to ORI, that that would be done. I thought that she testified, Dr. Hill, that she was not absolutely certain that she was correct because she was unfamiliar with and had difficulty using a particular microscope. Initially, back in 1999, there is testimony in the record to that effect. That's it. Well, then Dr. Howe could not have had Cianer, certainly, at that time. Well, the answer to that question is he most certainly could have. We're not dealing with individuals who are starting out with their first Gilbert science set. These are very intelligent people. And what the expert's testimony and what he should have known, given his level of knowledge, was that the results that Dr. Beshahi had obtained were incapable of being obtained based upon the fact of the particular properties of the stritiated thymidine, the medium that was used, what Dr. Robbins had put forth in his report. That goes to the very validity of the data. As I say earlier in my argument, he deliberately ignored all of those things by choosing a result that would favor his competing for limited research dollars. So do we discount the ORI report, then? You don't totally discount it because case law says it's probative. However, you have to take it into context. No, but we're dealing with Cianer here and knowledge. You're claiming that he knew and falsely went ahead. As I say, if you take into account that they only focused on the two available experiments there, not having any knowledge because Dr. Howell concealed his inability to replicate these, never told ORI, never told either of the committees of that fact, you have to, I think, discount to a degree the probative value of that report. Had they known all of those things, I believe the result could easily have been different and should have been different. And that's the purpose of what we're saying. The problem that I see from a policy perspective is that I do not think that, nor do I see anywhere in the False Claims Act, any language that accepts scientific research grants from the Act. If that is the case, that's a very dangerous precedent given that, especially on this grant, issues of public health are implicated. They may present difficulties, but nonetheless, I think courts are equipped to do it and when the public health is involved, they must very well do that. I don't know something that I should know and I'm embarrassed, but this is a False Claims Act. Correct. Is she seeking money, a monetary result? Is there such a thing? That's in play. That's one of the remedies that we did seek. Besides wanting retractions to be ordered, besides the return of the grant money. How much money? Did she have an amount? She's entitled under the law to a relater's fee. And how much would that be in this case? Now that the government's not involved, it's anywhere from 20 to 30 percent, as I recall. Percent of what? Of the grant. And how big was the grant? The grant was 2. Both grants together, $2.5 million. So she's seeking hundreds of thousands of dollars. That is one of the remedies that we have claimed in this proceeding, Your Honor. That is so. Thank you. Thank you. Oh, excuse me. Tony, any questions? No, no. Brooks, any questions? Okay, thank you. You saved rebuttal time, I assume. Did you save rebuttal time? Yes, I saved two minutes, Your Honor. Okay, thanks. Good morning, Your Honor. John Leonard on behalf of all three defendants, UMDNJ, Dr. Bishai, and Dr. Howell. If I may make some comments about what my colleague just said. The microphone is yours. You may make comments about anything. Thank you, Your Honor. Initially, the district court judge, Judge Kavanaugh, looked at the issue of what Dr. Howell knew in 1999. And I think it's imperative to understand at that point he had been working with Dr. Bishai for a couple years. Dr. Bishai and these Coulter count results have been found by every scientific committee that has looked at this, not to be results at all, but to be part of the methodology. When Dr. Hill approached Dr. Howell back in 1999, she had what she described to the committee as a hunch. She wasn't sure. Maybe Dr. Bishai was sloppy and she may be wrong. Dr. Howell replied, I don't think the information is fudged, and went ahead and submitted the grant. As we stand here today 12 years later, this isn't a conflict of opinion. There's no scientific body, there's nobody that's looked at this issue and found that information to be false or that decision to be wrong. Can you explain why nobody could replicate Dr. Bishai's results? Because as I understand it, knowing no science, that's what makes the scientific method. The ability to have somebody else go through the same thing and do it again. Yes, Your Honor. I think Judge Kavanaugh got this right. Failure to replicate is just that, failure to replicate. These are researchers, and you're going back to 1999, and as everyone has discussed, the committees and the experts, in this case below, there are innumerable items that could cause you not to be able to replicate an experiment. Didn't Dr. Howell have an obligation to notify NIH that it hadn't been replicated? Absolutely, unequivocally, no. And more importantly, Your Honor, now we're 12 years in the future, there have been hundreds of papers published on this issue. The bystander effect is well embraced at this point, and quite frankly, this is more of an academic dialogue now than it is a real dialogue. But I think what Judge Kavanaugh said at the time, and I think he's right, Dr. Howell submitting the grant, and later, in 2001, Dr. Hill saying, well, there's an inability to replicate, or I have issues with this. She did the right thing. She went to the committee, to UMD and J, they initially put a committee together, and they reviewed and interviewed everybody. Dr. Howell, Dr. Bishai, Dr. Hill looked at all the research material, and they found no basis to find scientific misconduct. Unhappy with that result, she went to ORI. And ORI did determine that the initial committee at the university was not composed of people really with sufficient background in the area, did they not? ORI, yes, Your Honor, ORI pointed that out, as well as other problems it had generally with the way UMD and J conducted investigatory research. That all said, ORI came to the same exact conclusion. And in ORI's report, it specifically does mention the failure to replicate. It's in ORI's report. And that was also mentioned in the second UMD and J report. So failure to replicate to all due respect, lay people like ourselves, is not the red herring that it sounds to somebody in the scientific community. In research, it happens all the time. What should we conclude from the fact that they then renewed the grant the second time? What does that show? I think it's the death now of Appellant's case. I mean, Appellant's last ORI investigation and conclusion happened in 02. She made it unhappy with that. She went back to UMD and J in 03. Another investigation, sequestering of documents. They come out and also say no scientific misconduct. And the ORI report is sent to NIH. It's sent to the two heads of NIH that are responsible for oversight. They take no action. And two years later, renew the grant. I think it's the death now. I think it puts Appellant's decade-long attempt to try to show that this methodology is more than it is or that it's a problem. I think it puts it to bed. Any questions? Any questions? Thank you very much. You're amazing. I sit down with the green light ones. It doesn't happen frequently. At the risk of being different, thank you. Just two points, Your Honor. Would you answer my last question? Sure. What happens to your case when NIH, after having all this information, including the ORI report, renews the grant? The statement that my colleague just said in terms of two individuals being copied at NIH, there's nothing in the record that actually says who those people are or what their positions were. Yeah, but isn't it, do you dispute that NIH renewed the grant? No, of course not. Okay. And then what should we conclude from the fact that NIH, with all of this information, renewed the grant? They don't give away money so lightly. No, they don't, nor should they, Your Honor. I think what the conclusion should be is that you have to focus on what information, again, was relied upon below. Again, all of the analysis at that point was based upon but two experiments, the 1999, the 2001. It wasn't until the U.S. attorney got involved, the subpoenas were issued, all of the other documents about the experiments that could not be replicated, all of the control data by which statistically we could show that this data was fraudulent, was not in the hands of Dr. Hill and had been concealed by Dr. Howell up until that point. But was in the hands of NIH. No, that information was not in the hands of NIH. But NIH knew that it hadn't been replicated. No, they did not know it had not been replicated. Well, the ORI report said that. No, the ORI result made mention of the fact that the notebooks had been requested but took issue with the committee not having the knowledge or wherewithal to go back to Dr. Lenarchik or to Dr. Howell to make inquiry as to why that could not be replicated. That is very significant. The second committee was in essence faulty or as inept as the first in that regard. The second committee looked at some statistical information and notes that they had Dr. Lenarchik's notebooks at that point in time which indicated that 18 to 21 of the experiments could not be replicated but failed in any way, shape or form to call Dr. Howell for an explanation about that or to call back Dr. Lenarchik for an explanation about that or to seek the expertise of someone in cell theory in order to provide some basis. So that's the issue. And then based on that, Dr. Howell just goes ahead, refiles the grant using that same data. And yes, the grant is committed but it's not sufficient for what Judge Kavanaugh sought to invoke in terms of the governmental knowledge defense because clearly there was a plethora of information which had he undertaken his duty to come forward with it, I believe would have changed the result. Thank you. Thank you. We'll take this case under advisement.